JODI LINKER
Federal Public Defender
Northern District of California
ELIZABETH FALK
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    (415) 436-7700
Facsimile:    (415) 436-7706
Email:        Elizabeth_Falk@fd.org

Counsel for Defendant WISE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 22–326 CRB |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| LEROY WISE, | **Court:**  Courtroom 6, 17th Floor |
| Defendant. | **Hearing Date:**  February 14, 2024 |
| | **Hearing Time:**  10:00 a.m. |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 2

    I.      Mr. Wise's Background ............................................................................. 2

    II.     The Instant Offense ..................................................................................... 6

    III.   Post-Indictment Conduct ......................................................................... 7

ARGUMENT ........................................................................................................................... 9

    I.      The Court Should Impose a Time-Served Sentence Followed by Three Years of Supervised Release Because the Court Has Already Deferred Sentencin for Six Months, and Mr. Wise Fulfilled His Promises to the Court over the Last 18 Months. ................ 10

    II.     Days-Long Time Served, Probationary, or Deferred Sentences Have Been Given Previously By this and Other Courts. ............................................................. 10

CONCLUSION ..................................................................................................................... 12

1

2

## INTRODUCTION

3      There are federal cases in which a genuinely good person has nonetheless lost his way and broken

4 the law; he winds up in federal court, which ends up changing the course of his life for the better.

5 Through the prosecution itself, as well as sincere reflection on the crime and the harm he has caused, this

6 defendant is completely deterred from ever committing another crime by deeply absorbing,

7 contemplating, and reflecting on his wrongs; by taking full advantage of and attending seriously to

8 pretrial supervision conditions, and working to prove that he is a better person than his terrible actions

9 that day.

10      Even rarer is the federal case where a violent criminal act occurs, but through in-depth pretrial

11 supervision and historical review, it becomes clear to all parties involved that this criminal act was

12 genuinely aberrant conduct by a person who has both the capability and the capacity to learn from a

13 terrible mistake.  In such a case, the defendant's actions before and after the crime allow the Court to

14 safely conclude that incarcerating that person – for either just punishment, deterrent, or rehabilitation

15 purposes – is not the sentence "sufficient but not greater than necessary."

16      Such is the case with Mr. Leroy Wise.  It is an extraordinary situation – one that this Court has

17 watched closely for the last eighteen months through the watchful eyes of U.S. Pretrial Services.  There is

18 absolutely no doubt that Leroy Wise committed a terrible crime.  As this memorandum will relay, the

19 Presentence Report indicates, and Mr. Wise will speak to at sentencing, there is nothing worse than a

20 violent assault on a person. He has internalized that remorse and shame, and rightfully so.  To the extent

21 he can, he has tried to make amends, understanding full well, however, that full amends to the victim are

22 impossible.

23      Under normal circumstances, this would be a prison case based purely on a review of the crime and

24 its factors themselves.  But when the Court looks at *all* the sentencing factors under § 3553(a), a different

25 conclusion emerges that this Court should not send Mr. Wise to federal prison because it would

26 completely destroy the substantial forward progress he has made. He is gainful and enthusiastically

27 employed in an essential non-profit field, has completed stopped using marijuana and illicit drugs, found

28 safe, stable housing for his family in a market-rate building, and has made a concrete plan for the future

that will undoubtedly deter him from future criminal activity.  It was for these reasons that the undersigned recommended Mr. Wise for the CAP program.  *See* Exhibit A, CAP Assessment (under seal). By the time of the assessment, however, Mr. Wise had successfully rehabilitated himself such that further placement in CAP was not approved because it was deemed unnecessary.  *Id.*  At the CAP assessment hearing, this Court was so pleased with Mr. Wise's progress that it stated as follows:

> I mean, I have my own ideas as to what we should do, but -- you know, I mean, it's that he has done so well that the CAP program doesn't seem to be addressed to problems that he has. That doesn't -- you know, that doesn't mean that he should necessarily be treated worse than he would be treated if he went into the CAP program. That makes no sense.

*See* Exhibit B, Transcript (July 26, 2023 hearing in *United States v. Wise*, CR-22-326 CRB) at 3. The Court then ordered the case deferred for six additional months, in order to provide the Court with a full 18-month picture of Mr. Wise's conduct post-indictment.  That period has now passed, and by everyone's account, Mr. Wise is doing extremely well and has built a life for himself and his family that all around him are proud of.  More than anything, the Court note that when provided a second chance, Mr. Wise seized the opportunity and did everything he could to prove that he was worthy of that chance.  As the Court admonished, and Mr. Wise acknowledged at the July 26, 2023 hearing:

> And, Mr. Wise, I mean, it's really important that you -- that you stay on this path. It's basically the difference of whether you go to jail or not, so, you know, can't be any clearer than that, can it?

*Id.* at 4.  Because Mr. Wise has stayed on the positive course he set, and has not veered, this Court should accordingly sentence Mr. Wise to time served, 3 years of supervised release, a $200 special assessment, and any ordered restitution.

## FACTUAL BACKGROUND

### I.    Mr. Wise's Background

Leroy Wise grew up in Bayview/Hunters Point area of San Francisco in various neighborhoods. His father and mother were never married, and were only 19 and 21 respectively when he was born. At the time of his birth in 1989, Leroy's father (Leroy Wise II, now known as Roy Wise) was active in a neighborhood street gang.  When his parents were in the house together, Leroy remembers his father as a violent and abusive individual towards his mother.  Due to his gang involvement, there was a steady police presence at the Wise home.  As early as five years old, Leroy has memories of

1  police forcibly raiding the house and arresting his father.  Before long, Leroy Wise Sr. was in state

2  prison, and Mr. Wise was without a father.  He reports his mother "managed to keep things together"

3  and did her best to keep him away from negative street influences.  In many ways, however, she was

4  fighting an uphill battle given the violent neighborhood forces at work, the absurd, high-crime area in

5  which Leroy grew up, as well as his father's longstanding associates.  To be sure, there was a ton of

6  pressure on "Lil Wise" to continue the family tradition of crime.

7         Fortunately, for the majority of his life, Leroy bucked the trend and was able to live a law-

8  abiding life.  When he was nine years old, his mother Felicia married Kevin Davis, a Muni driver

9  who had no involvement with the criminal justice system.  The Davis family ran a tight ship and

10 Felicia in particular did not hesitate to physically discipline Leroy with a belt.  This "tight ship"

11 worked for Leroy, as it kept him on the straight and narrow and was a significant change from the

12 chaotic home he had experienced with his birth parents.  For reasons unbeknownst to Leroy,

13 however, the Davis' changed residences every six months and he never was able to stabilize at any

14 one school.  PSR ¶ 49.  The constant moving, which Leroy believes now may have resulted from

15 financial strife, resulted in him always being the "new kid" in school and constantly having to prove

16 himself.  This lack of stability caused depression and anxiety in Leroy, who craved one home with a

17 single parent that was stable.  When he began to "act up" at home after one such move, Felicia

18 inexplicably sent Leroy to live with his father in the Bayview in order to keep peace with her own

19 husband.  This decision had devastating consequences, explained below.

20        As the Court is aware, the Bayview/Hunters Point neighborhoods in the early 2000s were

21 riddled with drugs and violence related to gang activity.  Leroy's father unfortunately lived in the

22 thick of it, and was a participant is a drug purveyor and a member of the BNT gang.  The Wise home

23 was a neighborhood hub for buying and using marijuana, and fourteen-year-old Leroy walked in and

24 had to live through the height of it.  Day after day, Leroy would come home from school and see the

25 same older neighborhood teens hanging out in his home high as kites who professed little to no

26 ambition in life.  He also saw significant violence on the streets of his neighborhood, including

27 shootings.  Some friends and acquaintances died; others began committing crimes as a way of getting

28 by.  Slowly but surely, the good school habits that Leroy's mother had ingrained in him started to

1    fade. His father encouraged him to use marijuana to dull the impact of hurts, so he did. A
2    predictable path followed. The more weed Leroy smoked, the less motivation he had. Eventually, he
3    dropped out of high school and opted to stay home with his father to smoke and "chill." By this time,
4    criminality and drug use were fairly normalized as mere elements of the environment Leroy lived in.

5         This all came to a raging halt, however, when Leroy had barely turned 17 and violence caught
6    up to Leroy Sr. A rival gang conducted a home invasion robbery on the Wise home and blasted
7    through the front door with gunshots. The bullets hit Leroy Sr. in the face and he almost died. Leroy
8    was home during the robbery and had to call 911 to try to save his father's life. As he watched his
9    father bleed out on the floor, reality hit Leroy in the gut that this so-called "life" was not for him. He
10   sent his father to the hospital in ana ambulance, packed up some things, and left the Bayview,

11        To his shock and surprise, his mother did not want him, indicating she had real fear of the men
12   after his father. At age 17, then, Leroy was essentially homeless – but he did not let that reality derail
13   him. He couch-surfed between aunts and went back to continuation high school, earning his high
14   school diploma in 2007. Somewhat miraculously, Leroy was able to shake his father's influence and
15   began to live his life in a gainful, productive way. He took college courses at City College in graphic
16   design, then obtained his first "real" job with his mother's help as San Francisco General Hospital as
17   an Eligibility Intake Clerk from 2009-2012.

18        One notable thing about Mr. Wise is that he has almost always maintained gainful employment
19   other than the months directly leading up to this offense. Throughout his 20s, he was able to eschew
20   the influences of old friends and rise above the violence and negative influences he had grown up
21   with. From 2012-2014 he worked in construction for the Local Union 67 (Hazmat); from 2014-2017
22   he worked at Frank & Grossman Landscaping company. In 2014, Mr. Wise had his first child, Tea,
23   and he tried to settle down and build a life with her mother, Jessica. This unfortunately unraveled
24   when Jessica developed a significant drug problem, such that she was no longer a safe caretaker nor a
25   good partner. Rather than run away from the situation, Leroy stepped up and petition for full custody
26   of Tea with the San Francisco family court. By 2017, he was a single full-time dad of a three-year
27   old at age 28; Jessica had moved to Washington State to try to find her way, and was not available.
28   He needed a job that provided him with childcare flexibility, and early-morning landscaping work did

1    not fit the bill.

2         Leroy found that balance at the Synergy School, where he was employed from 2017 until the

3    pandemic forced a shutdown.  By 2017, Leroy's father had undergone a metamorphosis of his own

4    following his near brush with death; he swore off drugs, gangs and a life of violence, moved out of

5    the Bayview and started working in education.  He introduced Leroy to Synergy after he became the

6    full-time music teacher, and for several years Leroy thrived working at the After School program and

7    teaching specialty classes in Photoshop and other creative arts.  This was the perfect job for Leroy

8    because he could balance flexible work at a caring, family-forward institution with his parenting

9    responsibilities.  The people at Synergy understood that he was a young single father and more

10   importantly, cared about him and his future.  During this period of time, Mr. Wise also reunited with

11   Marteal Barton, his on-again, off-again girlfriend from his youth who was impressed with the

12   changes she saw in Leroy after he became a father.

13        Then, the pandemic hit.

14        As an hourly employee at Synergy, Mr. Wise's employment and paycheck stopped abruptly in

15   March, 2020 as all the school in San Francisco shut down.  His daughter also got shut out of

16   kindergarten and needed to be home/Zoom schooled and cared for full-time. Rather then give up,

17   however, Mr. Wise rebounded.  By May, 2020 he started pandemic-related employment at

18   Community First SF, a non-profit organization that received substantial city funding to operate

19   shelter-in-place ("SIP") hotels for San Francisco's unhoused population in lieu of traditional

20   homeless shelters.  Because these hotels were at spread-out locations in the city, Community First

21   needed substantially more staff to provide check-in/check out support at the SIP hotels and ensure the

22   rooms were utilized and maintained in an orderly manner.  Mr. Wise jumped at this chance, and

23   began working night shifts.  This employment sustained the family for the duration of the pandemic,

24   and the couple was pleased to welcome their son, Ollie Wise in 2021.

25        As the pandemic wound down, however, so did the need for SIP employees.  In the middle of

26   2022, Mr. Wise was let go from Community First as the hotels were shut down and community

27   shelters started to re-open.  With a young son at home to care for during the day while Marteal

28   worked, Mr. Wise looked in vain for another night job that he could not find.  The night-work

arrangement had worked well for the family during the pandemic because it allowed the couple to each hold down a job without paying for expensive child care.  But for the first time that he could remember, Leroy had substantial trouble finding work.  His anxiety disorder kicked in full-force, which he self-medicated with Xanax.  This is the backdrop against which the instant offense occurred.

## II.   The Instant Offense

On August 9, 2022, Leroy Wise made the terrible, awful decision to target a postal worker in an armed robbery.  Why, at age 33, after years of following the correct path, working full time and full-time parenting his children, would Mr. Wise commit such a horrible crime?  The weight of that terrible decision, and terrible act, continues to haunt Mr. Wise to this day.  He has grappled with the "why" every day for the last year and a half – not to try to make an excuse for the crime, but the genuinely figure out what he could have been thinking.  What he knows is that he had fallen into a deep depression as the effects of the pandemic wore on, and could not believe he had turned 30 and had no genuine career or means of making a living at which he could advance.   And, along with the joy of Ollie's birth came the practical stressors of trying to raise two kids in an insanely expensive area.  As Mr. Wise recalls it, the pressures he felt mounted and he started taking large amounts of Xanax to cope with his chronic anxiety.  In what Mr. Wise now sees as a few-month period of temporary insanity, he turned to the wrong people for advice about how he could make progress in his life.  These were the exact people and lifestyle he had spent his twenties avoiding and to this day Mr. Wise is extremely disappointed and upset with himself that he allowed himself to revert to the seventeen-year old kid who came to understand violent street crime as routine.  That was a person Mr. Wise had worked hard to shake.  On that ill-fated afternoon, that person came back.

If there was any way Mr. Wise could take back his actions of that day against the victim of this crime, he would in a heartbeat.  He understands in his heart (and his Acceptance of Responsibility statement demonstrates same) that he cannot rightside what the victim has lost in this assault and that there is no amount of apology, nor explanation that can give back to the victim what he has lost.  More than anything, Mr. Wise regrets hurting this person because he knows from experience that traumatic incidents stay with you for the rest of one's life – and because this trauma occurred during

1   employment, the victim postal worker has to face this trauma every day.  Although it is insufficient,

2   and he knows it, Mr. Wise has nonetheless written the victim worker a lengthy apology letter in

3   which he has attempted to express these sentiments.  The letter has been delivered to the United

4   States Attorney's Office and will hopefully be delivered to the victim postal worker prior to

5   sentencing.

6          All told, there is not much Mr. Wise can say about this crime other than it was an awful,

7   terrible thing to do to another human being, and an incredibly dangerous thing to do at that.  He has

8   very much internalized the seriousness of his conduct and the extent of the harm he has caused, and

9   will continue to seek to make amends to the victim in any way necessary.

10  **III.   Post-Indictment Conduct**

11         As a result of rapid and good investigation work, Mr. Wise was quickly arrested and indicted in

12  this case.  Because of the nature of the crime, Magistrate Judge Sallie Kim was inclined to detain Mr.

13  Wise without bail.  An appeal from his family, including his mother and fiancé, eventually swayed

14  the needle for the Court.  Reluctantly, and with knowledge that Mr. Wise was a single parent to his

15  nine-year old daughter, Judge Kim agreed to test the waters of release with Mr. Wise at the halfway

16  house.

17         The shock of a federal arrest snapped Mr. Wise out of his multiple-month depression.

18  Ironically, although he now had much more to be depressed about, the clear mission he now had to

19  prove himself allowed him to lift up like he had not been able to before.  It was clear from the

20  beginning that Mr. Wise was determined to get back to the person he was.  Steadily, Mr. Wise rose

21  through the ranks at the halfway house and gained employment quickly at Pit Stop, the toilet

22  maintenance company for San Francisco's pandemic-installed bathrooms.  He moved in with his

23  mother, found work as a delivery driver, then finally found another night-watch position at the

24  Bayview Safe Navigation Center, where is now serves as a shelter supervisor making $28 an hour.

25  Per the PSR, Mr. Wise feels a deep connection to this line of work; he genuinely enjoys working with

26  people who are in significant need and "sees himself working there for a long time."

27         The night shift work is essential while Mr. Wise' children are young.  His fiancé' Marteal

28  works at the Arc in San Francisco, but this is a day job.  The two trade off childcare responsibilities

1  with staggered days off and shifts because the cost of childcare is astronomical and not something

2  their budget can afford.

3      Mr. Wise has also completely cut himself off from marijuana, Xanax, and non-prescription

4  opiates. Prior to the instant federal arrest, he was a longstanding user of both marijuana and

5  marijuana-laced edibles and oils, and self-medicated his anxiety disorder with illicit Xanax and cough

6  syrup. Over the last eighteen months, however, he has never delivered a dirty drug test.  He now sees

7  how harmful marijuana has been to his forward progress in life.  *See* PSR at ¶ 57 ("I am so much less

8  depressed, less slow, and so much more hopeful and productive when I do not smoke weed.")

9      Even more important for Mr. Wise's young family has been a successful placement through the

10  San Francisco low-income housing lottery.  He currently resides in a market-rate, modern condo

11  complex near the Embarcadero that sets aside a portion of the units for low-income San Franciscans.

12  Every day, his children and fiancé interact with working people, children headed to school or

13  daycare, and come and go in a safe environment free of violence, drug use and street-related crime.

14  Stable and secure housing has been a long-term goal for Mr. Wise in order to avoid exposing his

15  children to the street violence he grew up with.  He and his fiancé are making it work with dual

16  incomes and reduced rent; their living situation and provision for their children is something that both

17  take pride in.

18      Finally, the Court should consider the fact that Mr. Wise has suffered from serious health issues

19  over the last year.  In early August, 2023, Mr. Wise contacted the undersigned from the intensive care

20  unit at San Francisco General Hospital.  He was frightened and despaired, and further indicated that

21  he had some kind of stomach infection that the doctors could not diagnose.  Eventually, the infection

22  was at risk for becoming septic; doctors finally diagnosed diverticulitis and performed urgent

23  surgery.  Mr. Wise has continued to require the use of a colostomy bag and may need to continue this

24  treatment well into the future.  This condition was so advanced, and so severe that it left him in the

25  hospital for approximately a month.  Prior to diagnosis, Mr. Wise was under extreme stress because

26  his condition remained undiagnosed for a substantial period of time, and he contemplated death.  This

27  experience only furthered his resolve to continue to make amends in this case and to religiously

28  adhere to the new life path he has created that prioritizes family, stability, health and wellness.

The factors described above mitigate against a custodial sentence. Overall, Mr. Wise is a different person now than he was when this arrest occurred.  He is employed full-time as a valued supervisor at a respected non-profit agency. This type of role requires substantial organizational skills, expertise and patience – all qualities that suggest Mr. Wise has the tools to remain crime free and gainfully employed.  It bears mention that the nature of this work is also important.  Because Mr. Wise works at a non-profit and serves individuals less fortunate than himself, he is constantly exposed to people who relay stories of how their lives have been ravaged by drugs, violence and street crime.  The more people are connected to their community, the less likely one is to go out and harm it.  Community service work has indeed given Mr. Wise new purpose in life.

It is also significant that Mr. Wise has been more than fully compliant with U.S. Pretrial while on bail – he has also earned the trust of his experienced officer, who has watched Leroy carefully for 18 months and believes he is at very low risk for reoffending.  And the Court should take note of Mr. Wise' determination and diligence with the San Francisco Housing Authority.  After many years, he finally came up in the lottery system and was able to place his fiancé and children in a safe environment where law-abiding behavior is the norm – thus enabling him to break the familial cycle of negative influence and example that plagued him as a youth.  Marteal cannot afford this location without Mr. Wise's income.  Accordingly, it would be potentially tragic for Mr. Wise's young children to have to move back to the environment that the couple is so desperate to get away from.

All told, it would be a significant setback for this Court to interrupt Mr. Wise's significant life progress to send him to prison.  This Court should instead sentence Mr. Wise to time served, three years of supervised release, a $200 special assessment, and restitution.

## ARGUMENT

The Court is well versed in the § 3553(a) factors, and Mr. Wise need not repeat them here. Although most of the argument to keep Mr. Wise out of prison has been made in the Factual Recitation section, a couple of additional points bear repeating here in support of that request.

**I.    The Court Should Impose a Time-Served Sentence Followed by Three Years of Supervised Release Because the Court Has Already Deferred Sentencin for Six Months, and Mr. Wise Fulfilled His Promises to the Court over the Last 18 Months.**

Plainly and simply, for all the reasons stated above, the Court should make good on its prognosis from July 26, 2023, when it declared "keep doing what you are doing, it's basically the difference between whether you go to jail or not." Exhibit B at 4. The Court should keep Mr. Wise out of prison primarily because there has now been an 18-month period of time in which the Court has observed Mr. Wise's participation in pretrial release. This behavior demonstrates that he is amenable (and would thrive) if given a sentence of time served. The Court deferred this case for a reason, and the results speak for themselves. The Court should now conclude the deferment with a time-served sentence because all signs point to a conclusion that this Court will not see Mr. Wise as a repeat player in this system.

This result is also warranted if the Court looks at Mr. Wise's criminal history before the crime, or notably, lack thereof. At the age when many of his peers and friends from his neighborhood began full-force participation in criminal behavior, Mr. Wise consistently managed to keep his life turned in a different direction. Indeed, it is extremely rare for the Court to see this type of crime perpetrated by an individual with a near-perfect criminal record through his 20s. This is particularly extraordinary given Mr. Wise's familial roots and the environment in which he grew up. He is now 34 years old, and all the signs point to a conclusion that the instant criminal case was genuinely an aberrant act. Prison for rehabilitation or specific deterrence purposes is not necessary.

Finally, the undersigned considers it noteworthy as well that Mr. Wise's father, Leroy Wise Sr., has also completely turned around his life and now works as a fourth/fifth grade teacher at a private school in San Francisco. *See* Exhibit C, Website Profile of Leroy Wise, Sr. The fact that there is a familial lineage, and a positive example for Leroy in his father about how one can change one's life permanently for the good is a hopeful sign that Mr. Wise can continue to keep up the great work he has been doing post-release.

**II.   Days-Long Time Served, Probationary, or Deferred Sentences Have Been Given Previously By this and Other Courts.**

Both this Court and other courts have imposed time-served, probationary, or other non-

1   custodial sentences to defendants in similar circumstances to Mr. Wise; at risk clients who have been

2   exposed in or have participated in "the wrong crowd" and/or who have addiction issues, but

3   nonetheless show promise on pretrial release. Some examples from the years 2017 through 2020

4   follow:

5       18-136 CRB; *United States v. Ricky Rollins*. Charged with §922(g) after being chased and

6   caught with a loaded firearm (though Mr. Rollins was also on parole), the Court put Mr. Rollins into

7   the CAP program. He then apparently struggled and was dismissed from the program after suffering a

8   DUI. Gov. Memo, Dkt. 55 at 1. At sentencing, his Guideline range was 57-71 months. *Id.* at 2-3.

9   Notwithstanding what appears to be a violent criminal history, (id. at 4-5) this Court deferred

10  sentencing for Mr. Rollins in order for him to enroll in a treatment program and make different

11  choices for himself. Dkt. 57. After a 6 month deferral, this Court sentenced Mr. Rollins to time-

12  served, which was approximately 1 week of custody time as of that date.  Given that Mr. Wise's has

13  almost no criminal history (other than one misdemeanor conviction) and the recommended sentence

14  by Probation only 18 months, it would be a proportionate result under 18 U.S.C. § 3553(a)(6) after a

15  similar deferral to sentence Mr. Wise to time-served and three years of supervised release.

16      17-20 CRB, *United States v. Deon Grant*. This defendant faced a sentencing for 18 U.S.C. §

17  922(g), and faced a Guideline range of 46-57 months. Gov. Memo, Dkt. This Court instead deferred

18  sentencing by 1 year to allow the defendant to demonstrate good conduct. Dkt. 48. A year later, after

19  a successful deferral, this Court sentenced Mr. Grant to time served (Dkt. 61), who like Mr. Wise had

20  demonstrated a long law-abiding period prior to the arrest on the instant case (here, Mr. Wise's last

21  conviction is from 2013, or nearly 10 years prior to the instant offense – in *Grant*, the defendant had

22  demonstrated a 7 year arrest-free period). Per the defense sentencing memo, Mr. Grant had also

23  demonstrated a year-long period of pretrial supervised release prior to the deferral where he had

24  obtained employment and made strides with his drug addiction. Dkt. 45. If Mr. Grant could overcome

25  a suggested range of 46-57 months under similar circumstances, with a worse prior record, Mr. Wise

26  should be considered an excellent candidate for similar treatment.

27      20-24 CRB; *United States v. Gary Lewis*. This case is another point of comparison to Mr.

28  Wise's and should be strongly considered by the Court in connection with Mr. Wise's request for a

1   time-served sentence. Per the government's memo, Mr. Lewis was found by police sitting on a 4-

2   wheeler with a hunting rifle strapped to his chest. Dkt. 36. Unlike Mr. Wise, however, Mr. Lewis had

3   previously been convicted of 6 felonies. *Id.* After his federal arrest, like Mr. Wise, Mr. Lewis

4   obtained full-time employment and after initially faltering, successfully demonstrated compliance

5   with a drug treatment regiment, drug testing and counseling. Defense Memo, Dkt 35 at 2. Because of

6   his successes, Mr. Lewis was deemed unacceptable for CAP because he had rehabilitated himself on

7   his own – the same reason the Court declined to send Mr. Wise to CAP. *Id.* This Court instead

8   sentenced Mr. Lewis to three years of probation. Dkt. 41. The Court should do the same for Mr.

9   Wise.

10      19-131 WHO, *United States v. Neville Roebuck*. This case is a little different in fact pattern, but

11  serves as a strong example on the benefits of deferred sentencing, even for serious firearms cases. Mr.

12  Roebuck's case is different than Mr. Wise's in that he was on state court probation for small-time

13  methamphetamine-related prior convictions, but was caught on a probation search with a virtual

14  arsenal in his basement where he was manufacturing firearms, including "ghost guns" with

15  substantial firepower capacity. *See* PSR, Dkt. 38 at 6-17. He had been incarcerated for nearly 14

16  months by the time the federal government took over the prosecution. *Id.* at p. 1. Due to his rampant

17  methamphetamine addiction, the undersigned tried to get Mr. Roebuck into the CAP program by

18  means of a lengthy memorandum that supported the merits of that plan. Dkt. 24. The government

19  opposed, and the Court declined the CAP course, but instead agreed to put Mr. Roebuck into a

20  deferred sentencing plan for 1 year so he could demonstrate compliance and complete Pretrial

21  Services Courage to Change program. Dkt. 27, Minute Order (explaining decision for deferral.) One

22  year later, a highly successful Mr. Roebuck appeared for sentencing, but faced a daunting Guideline

23  range of 46-57 months for his conduct possessing (and assembling) ghost guns. Dkt 38, PSR at ¶ 67.

24  Judge Orrick instead sentenced him to time served and allowed him to continue his programming

25  through federal probation.

26                                  **CONCLUSION**

27      Now standing before the Court is a young man who has committed very serious criminal

28  conduct.  Overall, however, the way Mr. Wise has demonstrably led his life both before and after the

crime demonstrates that this very serious criminal act was, more likely than not, aberrant conduct that will not be repreated in the future.  On balance, and in review of Mr. Wise' entire life story, the Court should conclude that Mr. Wise' core is that of a rule-following person who has the wherewithal and the determination to live the rest of his life in a law-abiding manner.  Mr. Wise has pleaded guilty unconditionally and stands before the Court accepting responsibility for his actions and has delivered a full and complete apology to the victim in this case. His life has taken a significant upturn as a result of this federal prosecution, and his is grateful for that. It would be overkill and work against the interests of justice to send Mr. Wise to prison for the short time requested by the government and U.S. Probation given all the factors that are now on the table. No matter what, the signs all point to one conclusion; that this Court is not going to see Mr. Wise again, no matter what sentence this Court ultimately selects. And that more than anything is the best reason to forego a prison sentence.

For the aforementioned reasons, this Court should decline to impose a BOP sentence here, and sentence instead to time served, three years of supervised release, a $200 special assessment, and restitution.

Dated:       February 12, 2023                           Respectfully submitted,

                                                         JODI LINKER
                                                         Federal Public Defender
                                                         Northern District of California

                                                                     /S
                                                         ELIZABETH FALK
                                                         Assistant Federal Public Defender